**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ALAN BABISH,** | ) |
| **Plaintiff,** | ) |
| **v.** | )     **2:07-cv-1539** |
| | ) |
| **SEDGWICK CLAIMS MANAGEMENT** | ) |
| **SERVICES, INC., and PNC FINANCIAL** | ) |
| **SERVICES GROUP, INC.,** | ) |
| | ) |
| **Defendants.** | ) |

## <u>MEMORANDUM ORDER</u>

Pending before the Court in this ERISA case are the parties' cross-motions for summary judgment: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Document No. 25) and PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Document No. 26). Also pending are DEFENDANTS' MOTION TO STRIKE PLAINTIFF'S FACTUAL AVERMENTS AND EXHIBITS THAT ARE OUTSIDE THE SCOPE OF THE ADMINISTRATIVE RECORD (Document No. 34) and PLAINTIFF'S MOTION TO STRIKE DECLARATION OF JAMES S. GEHLKE, SR. (Document No. 37). The motions have been thoroughly briefed (Document Nos. 27, 30, 35, 38, 40-47), and are ripe for disposition.

<u>Procedural History</u>

This has not been a typical ERISA case. Throughout the course of this litigation, the parties have vigorously disputed the scope of permissible discovery and the contents of the administrative record. After extensive discussion, the parties and the Court reached an understanding that Defendant Sedgwick Claims Management Services, Inc. ("Sedgwick") would conduct a second review of the administrative claim file, as supplemented, and that there would

be no further discovery. It was clearly understood that the parties would be bound by the supplemented administrative record. The parties jointly submitted a proposed consent order which described the documents and information to be considered by Sedgwick.[1] On May 19, 2008, the Court entered a Consent Order (Document No. 13) and the case was stayed for 90 days for the purpose of conducting this second review.

Plaintiff was not satisfied by the outcome of the second administrative review and again sought to expand the record in this case. On October 9, 2008, the Court denied Plaintiff's motion for discovery and ordered that summary judgment briefs be filed. In addition to the pending cross-motions for summary judgment, Plaintiff has, for a third time, renewed his effort to expand the administrative record by submitting documents in Exhibits B and C. Defendants ask the Court to strike certain of these documents. Conversely, Plaintiff asks the Court to strike the Declaration of James Gehlke, which was submitted by Defendants to describe the operations and funding of The PNC Bank Corp. and Affiliates Long Term Disability Plan (the "Plan"). These preliminary matters concerning the scope of the record must be resolved prior to addressing the merits.

Scope of the Record

    A.    Plaintiff's Exhibits B and C

Plaintiff asks the Court to consider the following documents as part of the administrative record: (1) the Summary Plan Description (B1-6); (2) a May 16, 2007 letter from Plaintiff's

---

[1]Specifically, Sedgwick was instructed to evaluate Plaintiff's claim for long-term disability benefits as of April 20, 2007, to conduct a telephone interview with Ravi Kant, M.D., regarding Babish's medical condition as of April 20, 2007, to consider notes made by Ursula Teuter, Ph.D., on various dates (including April 28, 2007), and to review raw data of a Minnesota Multiphasic Personality Inventory ("MMPI") as conducted on or before March 1, 2007.

counsel with attachments (B7-19); (3) Sedgwick's response to the letter (B20); (4) an August 9, 2007 letter from Plaintiff's counsel, with attachments (B21-23); (5) a May 23, 2008 cover letter from Plaintiff's counsel enclosing an MMPI data sheet (B24-27); (6) a November 16, 2006 letter from PNC with handwritten notes (B29-31); (7) a February 20, 2007 FMLA notice and an October 13, 2006 form completed by Dr. Catena (B32-35)[2]; and (8) a September 24, 2008 Notice of Decision by the Social Security Administration (Exhibit C). Defendants ask the Court to strike certain of these exhibits and the related references in Plaintiff's Statement of Material Facts (¶¶ 22, 56, 58, 60, 61, 66, 75-77). Defendants do not move to strike B1-6, B11-18, or B29-31. The Court turns now to the specific contentions of the parties.

Plaintiff argues that the FMLA documents (B32-35) were submitted to Sedgwick prior to April 20, 2007, "but for some unexplained reason, were excluded from the Administrative Record." Defendants dispute that these documents were submitted prior to April 20, 2007. In any event, Defendants point out that it is undisputed that these documents were ***not*** part of the Administrative Record as of April 20, 2007 and thus, should not have been considered. The Court agrees with Defendants. The second review was clearly limited to documents that were contained in the Administrative Record.

In addition, Plaintiff argues that all of the documents may be considered as evidence of potential bias in determining what standard of review to apply. While Plaintiff is correct as a general proposition, *see Kosiba v. Merck & Co.*, 384 F.3d 58, 67 n.5 (3d Cir. 2004) (court has discretion to consider evidence of potential biases and conflicts of interest that is not found in the

---

[2]Plaintiff does not include a citation to B35. However, B35 appears to be an "attached sheet" that defines the term "serious health condition" referenced in the FMLA form.

administrator's record), he fails to recognize the unique procedural status of this case. Pursuant to the parties' agreement, Plaintiff obtained the benefit of a second review of his claim based upon a supplemented administrative record. In exchange, the parties agreed to be bound by that supplemented record. Both parties will be held to the terms of their bargain. Under the facts and circumstances of this case, the Court will not exercise its discretion to consider evidence of potential bias not found in the administrative record .

Finally, Plaintiff contends that Sedgwick's second review considered Babish's disability through the present time. The Court cannot agree. Reginald Givens, M.D., did conduct a phone interview of Ravi Kant, M.D., on July 1, 2008, during which Dr. Kant reported on Babish's condition after April 20, 2007. AR 45. Moreover, the July 31, 2008 letter from Sedgwick stated that Babish was able to perform his job "from March 28, 2007 through the present." AR 44. However, Sedgwick accurately summarized its duties under the Consent Order and recognized that the purpose of the interview with Dr. Kant was to consider "Plaintiff's medical condition as of April 20, 2007." AR 43. Sedgwick further recognized that it was "to perform a review of the administrative claims file for Mr. Alan Babish as of April 20, 2007." AR 43. The mere fact that Sedgwick reported the content of the phone interview with Dr. Kant does not establish that Sedgwick evaluated Babish's condition after April 20, 2007. Similarly, the passing reference to "through the present," in context, does not provide a basis for expansion of the administrative record.

Plaintiff's sole argument as to the Social Security decision in Exhibit C is that if the Court grants his motion for summary judgment, the Social Security benefits may be relevant in calculating damages. Defendant correctly points out that the Social Security decision was not

issued until September 2008, is not part of the administrative record, and in any event is not determinative of liability at this stage of the case. *Tegtmeier v. Midwest Operating Engineers Pension Trust Fund*, 390 F.3d 1040, 1046-47 (7th Cir. 2004)("While Social Security decisions, if available, are instructive, these determinations are not dispositive"). Exhibit C will be stricken from the summary judgment record in determining liability.

In sum, the Court will strike the exhibits and related factual averments to which Defendants object. Plaintiff agreed to the Consent Order, which specified the contents of the administrative record to be reviewed by Sedgwick, and his effort to further supplement the administrative record is contrary to the May 19 and October 9, 2008 Orders of this Court.

The Court will deny Defendants' request for counsel fees. Defendants did not object to all of the exhibits submitted by Plaintiff. Moreover, there is case law from the Court of Appeals for the Third Circuit that permits consideration of materials outside the administrative record for the purpose of determining the applicable standard of review.

In accordance with the foregoing, DEFENDANTS' MOTION TO STRIKE PLAINTIFF'S FACTUAL AVERMENTS AND EXHIBITS THAT ARE OUTSIDE THE SCOPE OF THE ADMINISTRATIVE RECORD (Document No. 34) is **GRANTED IN PART.** Specifically, B7-B10, B19-B28, B32-B35, Exhibit C and the corresponding references in Plaintiff's Statement of Material Facts are hereby stricken from the record.


B.      GAF Score and MMPI data

Defendants ask the Court to strike Plaintiff's "lay conclusions" regarding the purpose and meaning of his Global Assessment of Functioning ("GAF") score and his MMPI data, as set forth

in ¶¶ 39, 41, 52, 68 and 74 of Plaintiff's Statement of Material Facts.

Plaintiff accurately notes that the underlying medical records which reference his GAF and MMPI results are part of the administrative record. Dr. Kant and Dr. Teuter assessed GAF scores of 50 and 53, respectively. (AR 110, 114). Dr. Teuter stated on March 1, 2007 that the results of the MMPI test were valid and confirmed her impressions of Plaintiff's condition. AR 127.[3] Indeed, the Consent Order required Sedgwick to consider the "raw data of Plaintiff's MMPI" as referenced in the March 1, 2007 letter from Dr. Teuter. Thus, to the extent that Defendants are asking the Court to ignore these portions of the administrative record, the request is **DENIED**.

Plaintiff further contends that the Court is entitled to take judicial notice of matters of science and common knowledge. In *Sollon v. Ohio Cas. Ins. Co.*, 396 F. Supp.2d 560, 584 n.13 (W.D. Pa. 2005), Judge Standish described the GAF test by citation to the <u>American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders</u> 32 (4th ed.1994) ("DSM IV"). In *Lozada v. Barnhart*, 331 F. Supp.2d 325, 330 n.2 (E.D. Pa. 2004), the Court cited DSM IV to establish that a GAF score[4] of 41-50 indicates "serious" symptoms or any serious impairment in social, occupational or school functioning (e.g. unable to keep a job) and a GAF score in the range of 51-60 indicates "moderate" symptoms or moderate difficulty in social, occupational, or school functioning (e.g. conflicts with peers or coworkers). *See also United States v. Murdoch,* 98 F.3d 472, 479 & n.5 (9th Cir. 1996); *United States v. Cantu*, 12 F.3d 1506,

---

[3]An MMPI "data sheet" is contained at Exhibit B27, but the only date on that document is May 20, 2008. The Consent Order specified that Sedgwick was to consider only the MMPI data as referenced in Dr. Teuter's March 1, 2007 letter and as conducted on or before March 1, 2007. For the reasons set forth above, the Court will not consider Dr. Teuter's letter dated May 20, 2008 or the MMPI data attached thereto.

[4]A GAF score is sometimes referred to as DSM IV - "Axis V." *See* AR 110.

1509 n. 1 (9th Cir. 1993); *United States v. Johnson*, 979 F.2d 396, 401 (6th Cir. 1992) (taking

judicial notice of diagnostic standards set forth in DSM IV).   In *United States v. Wilson*, 493 F.

Supp. 2d 348, 351 n.2 (E.D.N.Y. 2006), the Court explained that the MMPI is "a widely used

written psychological assessment used to diagnose mental disorders. The MMPI is used to screen

for personality and psychosocial disorders; it is also frequently administered as part of a

neuropsychological test battery to evaluate cognitive functioning." *See also United States v.

Denton*, 396 F. Supp.2d 987, 995 n.7 (N.D. Iowa 2005) (MMPI is "an assessment of personality

characteristics and overall level of emotional adjustment").   The Court similarly will take judicial

notice of these definitions and will consider the references to the GAF and MMPI results

contained in the administrative record as of April 20, 2007.   However, the GAF and MMPI results

do not establish, as a matter of law, that Babish was disabled or that Defendants abused their

discretion.[5]

   Defendants also object to the following "facts" proposed by Plaintiff that relate to the

GAF and MMPI scores: (1) that Larry Nahmias, M.D., was "untrue" in stating that "formal

cognitive testing" was not performed on Babish; (2) that the July 31, 2008 letter from Sedgwick

"ignored" the MMPI and GAF; and (3) that Dr. Givens was incorrect in stating that "no specific

testing of cognitive functioning is documented."   Plaintiff's Statement of Material Facts ¶¶ 52, 68,

74.   The Court will not accept these legal conclusions as undisputed facts.[6]   To the contrary, Dr.

---

[5]This evidentiary dispute is for all intents and purposes moot, as the GAF and MMPI scores have no impact on the Court's decision.

[6]Defendants contend that Dr. Teuter and Dr. Kant "both specifically stated that no cognitive testing of [Babish] had been performed prior to the closure of the Administrative Record."   The only direct reference the Court has located is a statement by Dr. Teuter that "no neuropsychological testing has been performed at this point."   AR 86.   The statements at AR 43

Givens specifically noted that the medical records provided for his review included the MMPI test and repeatedly recognized that such a test had been performed. (AR 45, 46, 47), and the July 31, 2008 letter from Sedgwick specifically noted "that Alan Babish had a MMPI." (AR 44). At most, there may be a semantic dispute as to whether GAF and MMPI constitute "formal cognitive testing" but there is no basis to conclude that Sedgwick ignored or was untrue regarding the GAF and MMPI results that existed as of April 20, 2007.

Accordingly, this aspect of Defendants' Motion to Strike is **GRANTED IN PART AND DENIED IN PART**. The Court will take judicial notice of the description and diagnostic standards of the GAF and MMPI tests and will consider the references to those tests which are contained in the supplemented administrative record. The Court will not accept as undisputed the referenced averments in Plaintiff's Statement of Material Facts ¶¶ 52, 68, 74.


C.      Gehlke Declaration

Plaintiff asks the Court to strike the Declaration of James Gehlke. Defendants argue that it may be considered for the limited purpose of determining the appropriate standard of review. As noted above, in *Kosiba*, 384 F.3d at 67 n.5, the Court of Appeals held that courts have discretion to consider evidence beyond the administrative record when deciding the applicable standard of review. Defendants have consistently opposed discovery on this specific topic, did not file the Gehlke Declaration until after Plaintiff filed his summary judgment brief, and never disclosed Gehlke as a potential witness. Neither party will be permitted to unilaterally supplement the

---

and AR 45 ("per Dr. Kant, no specific testing of cognitive functioning had been or has been done") were made by Sedgwick, although in the context of summarizing a phone interview with Dr. Kant.

administrative record which the parties jointly agreed upon, as formalized in the May 19, 2008 Consent Order.  Accordingly, PLAINTIFF'S MOTION TO STRIKE DECLARATION JAMES S. GEHLKE, SR. (Document No. 37) is **GRANTED**.


Factual Background

      Babish was employed by PNC as a software engineer for approximately fifteen years, until September 26, 2006.  Babish participated in PNC's disability plan, which provided benefits for short and long-term disability.  PNC self-funded the Plan and served as the Plan Administrator.  Pursuant to a Service Agreement, Sedgwick received, investigated, administered and responded to LTD claims filed against PNC.

      Under the Plan, an employee is "Totally Disabled" because of injury or sickness if he "cannot perform each of the material duties of his or her regular occupation."  AR 250.  After 24 months, the disability must prevent the employee from performing the material duties of any gainful occupation for which the employee is reasonably suited by training, education or experience.  LTD benefits for mental illness, including mental, nervous or emotional disorders, are limited to 24 months unless the conditions set forth in the Plan are met.  AR 258.

      The job description for Software Engineer III required Babish to, among other things, perform software development for requests of a complex nature, design, code, install, modify, test, debug and document software.  The Software Engineer III job also required problem resolution and off-hour support and required interaction with other members of a team and service partners.  Minimum skills and abilities included solid technology planning and organizational skills, the ability to participate in team-based problem solving, and attention to detail.  AR 99-103.

Beginning in 2002-2005, Babish began to experience symptoms of depression and anxiety. He began to feel overwhelmed by fatigue and dread and had difficulties concentrating on tasks. These symptoms, as well as paranoia, dysphoria, hopelessness and stress, culminated in a complete inability to function in September 2006. Babish consulted his primary care physician, Michael Catena, M.D., who prescribed Xanax, an anxiety medication which did not address his depression or panic symptoms. AR 85-86, 109-110. Babish was seen monthly by Dr. Catena.

Babish applied for short-term disability and Dr. Catena submitted forms in support of that application. Dr. Catena opined on November 10, 2006 that Babish experienced panic attacks and was unable to sleep or concentrate such that he "will not be able to do his duties at the PNC." AR 151. Dr. Catena noted: "Prognosis is good for his return to work full time," although the date for his return to work was unknown. *Id.* On December 8, 2006, Dr. Catena reported "no changes," opined that Babish's condition was "guarded," and stated "I do not think Alan will be able to return for full time employment." AR 152. PNC approved Babish for short-term benefits.

On November 30, 2006, Babish completed an application for LTD benefits. Babish reported that his doctor had not restricted his activities, that he was able to leave home without help and that his "daily living and social activities are affected." Dr. Catena completed a form in support of this application on December 8, 2006. AR 165-167. Dr. Catena diagnosed an "anxiety disorder" with no secondary diagnosis or complications and opined that Babish had not reached his maximum medical improvement. His prognosis was "guarded." On December 15, 2006, Sedgwick asked Dr. Catena for his records and additional information. On December 28, 2006, Dr. Catena responded and stated that Babish's diagnosis was "anxiety stress disorder" for which he was prescribed Xanax, that Babish was "unable to concentrate on his work" and that Babish

had not been referred to a pyschologist or psychiatrist. AR 142. By letter dated January 24, 2007, Sedgwick denied Babish's application for LTD benefits. After reviewing the information provided by Babish and Dr. Catena, the letter observed: "You were never referred to a psychiatrist or psychologist. There is no indication of any therapy or treatment for you [sic] psychiatric condition for which you are claiming total disability." AR 52.

On February 2, 2007, Dr. Catena sent a letter to Sedgwick in which he opined that Babish was totally disabled for his position as a software engineer and stated that Babish had been referred to a psychologist. AR 139. On February 5, 2007, Babish appealed Sedgwick's decision to deny LTD benefits. On February 14, 2007, Babish began treatment with Ursula Teuter, Ph.D., a psychologist. In a letter to Sedgwick on February 21, 2007, Dr. Teuter recited Babish's symptoms of depression and anxiety and opined:

> He is currently not able to function in his profession as he is unable to concentrate and to focus, but is preoccupied, instead, with any number of fears and worries. He was treated for anxiety - but has not received any treatment for depression so far.

AR 130. Dr. Teuter, in turn, referred Babish to a psychiatrist for a "more specialized medication regimen." *Id.*

On March 1, 2007, Dr. Teuter sent a letter to Tim Prater of Sedgwick's Appeals Unit. Dr. Teuter stated "that the results of [Babish's] MMPI – which is valid – confirm my impressions. Depression and anxiety scales are significantly elevated even though his test taking attitude was one of trying to minimize problems and to present himself in the best possible light." Dr. Teuter also informed Sedgwick that Babish was scheduled to see a psychiatrist on March 8, 2007 and requested that the results of that visit be considered in evaluating LTD benefits.

Babish first met with Ravi Kant, M.D., on March 3, 2007. Dr. Kant summarized the HPI

(history of present illness) as follows:

> Patient gives [history of] depression for last couple of years and much worse now with [symptoms] of dysphoria, irritable, fatigue, insomnia, crying episodes, feeling hopeless, worthless, low self esteem, problems with drive and initiative. Denies any suicidal thoughts, intent or plan. gets nightmares at times. No symptoms of psychosis, OCD or PTSD. Not able to conc[entrate] and has prob[lems] with ST memory, not able to function at work. had to quit job and go on ST disability since Sept. 06, has worked there 15 yrs. has been taking Xanax as prescribed by PCP, reports [symptoms] of HA and neck pain, not sleeping well, feels stressed, now financially struggling, wife is working and she is pregnant and due soon.

Dr. Kant diagnosed Babish with major depressive disorder and anxiety disorder, assigned a GAF score of 50, and prescribed zoloft at 25 mg. AR 114.

On March 27, 2007, Babish had a second appointment with Dr. Kant. After repeating the HPI contained in his earlier notes,[7] Dr. Kant reported the following:

> [Patient] seen for [followup] for depression and anxiety and anger issues. has been doing sig[nificantly] better. not been feeling angry now. in good spirits. no med side effects. has an [a]ttorney for LT disability and for SSDI. conts in therapy now. has gone off Xanax now. sleep and appetite are good. still some nightmares but much less now and not frequent. no SI/HI. still having s[o]me back pain.

AR 115. Dr. Kant further reported: "Active alert and Ox3. Mood is much better now and looks relaxed. Speech normal and eye contact NL. No S/I or H/I at this time. ongoing stress with his current situation." *Id.* Dr. Kant continued the zoloft at 50 mg. for mood and anxiety symptoms and noted "has been doing sig[nificantly] better with it." *Id.* A followup appointment was scheduled in four weeks. Dr. Kant did not assign a GAF score on March 27, 2007.

On March 28, 2007, Dr. Teuter prepared a report for Sedgwick, which she modified and

---

[7]Plaintiff contends that the March 27, 2007 notes reflect that Babish's depression is "much worse now...." The Court cannot agree. A review of Dr. Kant's March 27, 2007 notes reveals that the reference to "much worse now" was merely copied from the HPI that had been recited by Babish during the initial meeting on March 3, 2007. There is an entry dated "3/27/07" which contains new information. *Compare* AR 114 and AR 115.

faxed on April 1, 2007.  Dr. Teuter reported that she had seen Babish on five occasions, although she did not list the dates.[8]  Dr. Teuter commented that Babish was extremely anxious and often angry, was currently unable to focus and to concentrate, that his thoughts were racing and not particularly orderly or linear and permeated by paranoid ideation, and that "initially he was very upset and agitated."  AR 107.  Dr. Teuter recorded the symptoms of major depression and anxiety that Babish began to experience in the middle of 2005 and explained that the Xanax prescribed by Dr. Catena did not alleviate his depression or his perception that he was set up to fail by a hostile environment.  Dr. Teuter reported Babish's fear of having a complete mental breakdown, the fear that he might "snap and hurt someone," the disarray and disorganization in Babish's home and his fear that his mental abilities had deteriorated.  Dr. Teuter then commented:

> He continues to report and exhibit labile mood.  He continues to exhibit and report symptoms of major depression, and extreme and pervasive anxiety.  He is unable to keep focused and to concentrate.  Since he has been coming in for therapy and since he has started to take some anti-depressant medication, he seems slightly less panicked, but he continues to be unable to fulfill his job duties.

Dr. Teuter assigned a GAF score of 53, and invited Sedgwick to call her if there were any questions.

On April 20, 2007, Sedgwick partially reversed the denial Babish's claim and awarded LTD benefits from December 27, 2006 through March 27, 2007.   The medical information and the Software Engineer III job description were reviewed by Larry M. Nahmias, M.D., a board-certified specialist in psychiatry, although Dr. Nahmias was unable to speak with Dr. Kant due to

---

[8]Plaintiff argues that Dr. Teuter saw Babish on March 28, 2007.  Although it can be inferred that Dr. Teuter saw Babish some time after March 3, 2007, when Dr. Kant first prescribed anti-depressant medication, there is no evidence that Dr. Teuter met with Babish on or about March 28, 2007.  Dr. Teuter did see Babish on April 12, 2007.

the lack of an appropriate release.  Sedgwick summarized the basis for its decision as follows:

> The specialist noted that based on the documentation provided, you were noted to
> have a documented severity of condition for which those occupational functions
> would be precluded.  You were noted to have not yet received appropriate
> psychiatric management early on in your diagnosis.  You were documented to be
> unable to perform at a high cognitive level and your documented symptomology
> would have precluded your normal occupational function for a period of time. [Dr.
> Nahmias] further noted that as of the evaluation with Dr. Kant on March 27, 2007,
> you were reported to have improved.  This improvement is noted to be of a degree
> to sustain a return to gainful and steady occupational activities.

AR 55.  Sedgwick noted that although some "findings were referenced," none were so severe as to

prevent Babish from returning to his occupation as a software engineer.  AR 56.

After this decision was made, Babish provided another report from Dr. Teuter dated April

26, 2007.[9]  AR 85-87.  The report stated that Dr. Teuter saw Babish on a weekly basis.  His most

recent visit was on April 12, 2007.  Dr. Teuter diagnosed "Major Depression, severe, single

episode [and] Generalized Anxiety Disorder."  After describing the history of Babish's symptoms

and treatment, Dr. Teuter opined:

> Mr. Babish has been responding to the Zoloft in that he has been able to manage
> his anger much better and to temporarily reduce his obsessive worrying and
> paranoid preoccupations.  However these minor gains instantly vanish whenever he
> has to interact with those institutions in the outside world he perceives to be
> opaque, confusing, callous, heartless, and possibly motivated to cause him harm.

Dr. Teuter further observed that Babish's wife was expecting their first child, which contributed to

his anxiety "as he cannot conceive of not being the provider for his family yet is aware that he is

unable to function at this point."  Dr. Teuter stated that "No Neuropsychological testing has been

performed at this point."  Babish's thought processes still included much paranoid ideation and

were disorganized and his insight was poor.  Babish's concentration was "poor and very

---

[9]Pursuant to the Consent Order, Sedgwick was required to consider this report.

disorganized." He expressed rage by means of sarcastic joking. Babish's appearance was casual and appropriate but sometimes disheveled and his memory was intact overall. Babish had learned that his LTD claim had been denied, which caused a resurgence of fear and paranoia. Babish did not have regular panic attacks, but often felt very anxious. AR 85-87.

Upon receipt of the Consent Order, Sedgwick forwarded the required information to Reginald Givens, M.D., a board-certified specialist in psychiatry, for review. Dr. Givens held a telephone conference with Dr. Kant as contemplated by the Consent Order, who reported that on Babish's visit on March 27, 2007, Babish had trouble sleeping and a depressed and anxious mood, but no at-risk behavior and no delusional thoughts or hallucinations. AR 45-48. Dr. Kant informed Dr. Givens that no specific testing of cognitive functioning had been or has been done.[10] Dr. Givens reviewed the notes provided by Dr. Kant and Dr. Teuter. Dr. Givens acknowledged Dr. Teuter's observation that Babish's profile was often found in persons who are depressed and not psychologically insightful. However, Dr. Givens concluded that Dr. Teuter's letter "did not report any other objective evidence of cognitive dysfunction or any report of any suicidal or homicidal intent, or any delusional thoughts or hallucinations." Dr. Givens opined that "there is insufficient objective evidence to support cognitive dysfunction that would prevent Alan Babish from performing occupational duties." AR 46. Accordingly, on July 31, 2008, Sedgwick issued a letter which denied Babish's claim for LTD benefits. AR 42-44. Sedgwick concluded: "Although some findings were referenced, none were documented to be so severe as to restrict, limit or otherwise completely prevent Alan Babish from performing the essential functions of his regular

_____

[10]Dr. Kant further informed Dr. Givens that he continued to see Babish monthly and that during a visit on June 3, 2008, Babish's mood had regressed. AR 45. This statement is outside the scope of the Administrative Record and will not be considered.

occupation of a Software Engineer III from March 28, 2007 through the present."  AR 44.

Standard of Review

The parties disagree on the standard of review that should be applied in this case.  Plaintiff argues first for a *de novo* review.  Plaintiff acknowledges that the Plan conferred discretion upon PNC, but argues that there was no express delegation of this discretion to Sedgwick.  Defendants contend that an abuse of discretion standard applies.  The Court agrees with Defendants.  PNC is defined as the "Plan Administrator" or "Administrator."  AR 249.  The Plan states: "The Administrator shall be vested with all the power, authority and discretion necessary to supervise and control the operation of the Plan in accordance with the terms thereof."  AR 260-261.  As one specifically-enumerated power, PNC may "appoint or employ individuals or firms to assist in the administration of the Plan and any other agent or agents it deems advisable."  AR 261.  Further, the Plan states that the Administrator "shall have complete and sole discretion" with regard to the enumerated powers and that its decision shall not be overturned unless it is arbitrary and capricious.  *Id.*  PNC entered into a Services Agreement with Sedgwick, AR 225-243.  The Services Agreement contains a "Description of Services" which provides that Sedgwick, among other things, was to be responsible for administration and determination of eligibility for benefits regarding long-term disability ("LTD") claims.  This arrangement was specifically contemplated by the Plan – in other words, Sedgwick was hired to assist PNC with the exercise of its discretionary authority.  Accordingly, the Court has little difficulty in concluding that a *de novo* review is not warranted.  *See also Cloud v. PNC Financial Services Group, Inc.*, 2009 WL 255631 (E.D. Pa. Jan. 30, 2009) (applying "arbitrary and capricious" standard of review to LTD

claim involving the same Plan).

Alternatively, Plaintiff argues that a heightened, sliding-scale review is justified due to substantive and procedural conflicts of interest. In *Post v. Harford Ins. Co.*, 501 F.3d 154, 161 (3d Cir. 2007), the Court of Appeals for the Third Circuit applied a "sliding scale" approach in which the degree of deference given to the decision of the plan administrator varies based on the degree of the administrator's conflict of interest. As the Court of Appeals explained:

> [t]he premise of the sliding scale approach is that courts should examine benefit denials on their facts to determine whether the administrator abused its discretion. To apply the approach, courts first consider the evidence that the administrator acted from an improper motive and heighten their level of scrutiny appropriately. Second, they review the merits of the decision and the evidence of impropriety together to determine whether the administrator properly exercised the discretion accorded it. If so, its decision stands; if not, the court steps into the shoes of the administrator and rules on the merits itself.
>
> At its best, the sliding scale reduces to making a common-sense decision based on the evidence whether the administrator appropriately exercised its discretion. This theme, rather than getting bogged down in trying to find the perfect point on the sliding scale, should be district courts' touchstone.

*Id.* at 161-62 (*citing Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377, 391-394 (3d Cir.2000)).

Shortly thereafter, the United States Supreme Court issued its decision in *Metropolitan Life Ins. Co. v. Glenn*, 128 S. Ct. 2343 (2008). The issue in *Glenn* was "whether the fact that a plan administrator both evaluates claims for benefits and pays benefits claims" creates a conflict of interest and how this type of conflict "should be taken into account on judicial review of a discretionary benefit determination." *Id.* at 2348, 2350. The Supreme Court found that these circumstances created a conflict of interest that should "be weighed as a factor in determining whether there is an abuse of discretion. " *Id.* at 2350. The Court explained that although a

reviewing judge must take account of structural and procedural conflicts[11] when determining whether the trustee has abused his discretion, the standard of review does not change from deferential to de novo review.  *Id.*  The Supreme Court noted that trust law continues to apply a deferential standard of review to discretionary decisions made by conflicted trustees.  *Id.*

It is unclear whether the "sliding scale" approach in *Post* remains viable after *Glenn*. *Compare Wilce v. Proctor & Gamble Disability Ben. Plan*, 2008 WL 4279522 *5-7 (M.D.Pa. Sep.11, 2008) with *Ellis v. Hartford Life And Acc. Ins. Co.*, 2009 WL 154301 *1 (E.D.Pa. Jan.22, 2009).  Several courts have concluded that it is not necessary to decide this issue.  *See generally Kalp v. Life Ins. Co. of North America*, 2009 WL 261189 *5 (W.D. Pa. Feb. 4, 2009) (citations omitted).  The facts and circumstances of this case fall into this category, as well.  It appears that at least the "touchstone" described in *Post*, i.e., that the reviewing court should make a "common-sense decision based on the evidence [as to] whether the administrator appropriately exercised its discretion," is consistent with the discussion in *Glenn*.  In any event, as the Court explained above, a *de novo* review is not warranted and the distinction, if any, between the *Post* and *Glenn* approaches to the "arbitrary and capricious" standard of review do not affect the outcome of this case.

As summarized in *Cloud*, 2009 WL 255631 *2 (citations and punctuation omitted):

The arbitrary and capricious standard's scope of review is narrow, and the court is

---

[11]"The structural inquiry focuses on the financial incentives created by the way the plan is organized, whereas the procedural inquiry focuses on how the administrator treated the particular claimant." *Post*, 501 F.3d at 162. A structural conflict arises when an entity "both determines whether an employee is eligible for benefits" and also pays benefits under the plan. *Glenn*, 128 S.Ct. at 2346. A procedural conflict involves the examination of "the process by which the administrator came to its decision to determine whether there is evidence of bias." *Post*, 501 F.3d at 165 (*citing Pinto*, 214 F.3d at 393).

not free to substitute its own judgment for that of the administrator in determining eligibility for plan benefits. Further, the arbitrary and capricious standard limits the court's review to the record before the administrator at the time of the decision. Under the arbitrary and capricious standard of review, the whole record consists of that evidence that was before the administrator when he made the decision being reviewed. The Third Circuit has determined that an administrator's decision may be found arbitrary and capricious if the decision is without reason, unsupported by substantial evidence or erroneous as a matter of law. Under the arbitrary and capricious standard, as long as the administrator's decision was reasonable and supported by evidence, the court must uphold the administrator's decision.

In particular, Plaintiff points to the following alleged conflicts: that PNC both funded and administered the Plan, that PNC funded the Plan on a case-by-case basis and instructed Sedgwick to provide "an action plan directed toward closure of each claim," that Defendants ignored job duties that conflicted with Babish's condition, that Defendants ignored cognitive testing, that Defendants failed to request medical information beyond April 20, 2007, that Defendants lacked written procedures in administering benefits claims, that Defendants used "self-serving selectivity" in interpretation of physician notes, and that Defendants ignored opinions of treating providers, particularly Dr. Teuter.[12]

Sedgwick was paid a fixed annual fee, such that it had no structural conflict. AR 223-224. The Plan was self-funded by PNC, so PNC did receive an indirect financial benefit from the decision to deny LTD benefits to Babish. However, this fact does not justify a heightened standard of review. *See Kotrosits v. GATX Corp. Non-Contributory Pension Plan for Salaried Employees*, 970 F.2d 1165, 1173 (3d Cir. 1992) ("Where, as here, however, the record shows no direct impact on the Plan sponsor and only a possibility of future indirect consequences to it, we conclude that it is appropriate to enforce the Plan as written and defer to the discretion of the Plan

---

[12]Some of Plaintiff's contentions will be addressed during the discussion of the merits of the decision.

fiduciaries").  The Court does not agree that there is evidence of any procedural bias on this

record.  Sedgwick obtained reviews and opinions from two independent reviewers, both of whom

were board-certified psychiatrists.  Sedgwick provided ample opportunity for Babish to

supplement the record.  Most notably, Defendants performed a second review of Babish's claim –

based on an agreed-upon supplemented record.[13]  In summary, an abuse of discretion standard of

review will be applied.


Legal Analysis

     1.       Proper Defendants

There is a circuit split of authority as to whether claims under ERISA § 502(a)(1)(B), 29

U.S.C. § 1132(a)(1)(B),[14] may be brought against Plan administrators or only against the Plan

itself.  *See, e.g., Hall v. Lhaco, Inc.*, 140 F.3d 1190, 1194 (8th Cir. 1998) (citing cases).  Although

the Court of Appeals for the Third Circuit has not resolved this issue directly in the context of §

(a)(1)(B) claims, the strong inference from the Court's prior opinions is that such claims may be

brought against Plan administrators acting in a fiduciary capacity.[15]  *See Burstein v. Retirement*

*Account Plan for Employees of Allegheny Health Education & Research Foundation,* 334 F.3d

---

    [13]The Court rejects Plaintiff's contention that Defendants failed to comply with the procedural safeguards set forth in 29 C.F.R. § 2560.503-1.

    [14]The statute states, in relevant part: "A civil action may be brought– (1) by a participant or beneficiary . . . (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

    [15]Defendants have clearly asserted their discretionary authority in seeking an "abuse of discretion" standard of review.

365, 382 & n.23 (3d Cir. 2003) (plaintiff could seek to enforce claim for benefits under §

(a)(1)(B) against Plan and administrator); *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433 (3d Cir.

1997) (entertaining a suit against the plan administrator to recover benefits pursuant to §

(a)(1)(B)); *Curcio v. John Hancock Mut. Life Ins. Co.*, 33 F.3d 226, 233 (3d Cir.1994) (noting that

ERISA permits suits to recover benefits against the plan as an entity and against the fiduciary of

the plan, and finding that a plan administrator is such a fiduciary). Defendants' effort to

distinguish § (a)(3) cases is unavailing. In *Briglia v. Horizon Healthcare Services, Inc.*, 2005 WL

1140687 (D.N.J. 2005) (citations omitted), the Court explained that there is "no reason to believe

that the Third Circuit would distinguish between these subsections of Section 502(a)." In Glenn,

128 S. Ct. 2343, the Supreme Court considered a § (a)(1)(B) claim brought against a plan

administrator. *See also West v. Sedgwick Claims Mgt Serv. Inc.*, 2006 WL 4542715 (W.D. Ky.

2006) (rejecting identical argument made by Sedgwick). In accordance with these decisions, the

Court concludes that PNC and Sedgwick are proper defendants.


2.      Denial of Benefits

The Court now turns to the merits of whether Defendants properly exercised the discretion

provided under the Plan. Plaintiff argues strenuously that the Court should reverse the decision to

deny benefits. Plaintiff reasons that Sedgwick and Dr. Nahmias conceded that Babish was totally

disabled through at least March 27, 2007 and that Babish's condition did not improve thereafter.

Plaintiff points to the treating notes of Dr. Kant and Dr. Teuter as evidence that Babish continued

to be unable to work and argues that Defendants selectively quoted from Dr. Kant and ignored Dr.

Teuter's opinion. Plaintiff further argues that Defendants made a "subtle change" in the Plan's

definition of disability by concluding that Babish's condition did not "completely" prevent him from performing the essential functions of his job.

Defendants argue that Babish's claim was reviewed by two independent medical reviewers, both board-certified in psychiatry, who performed a thorough and exhaustive review of the agreed-upon administrative record and determined that Babish was not totally disabled. Defendants contend, in essence, that Dr. Kant's notes on March 27, 2007 demonstrated that Babish had improved significantly once he received appropriate treatment for his depression such that he could return to work. In addition, Defendants contend that neither Dr. Kant nor Dr. Teuter performed cognitive testing or explained why the GAF and/or MMPI results indicated that Babish was totally disabled.

As an initial matter, the Court acknowledges that Dr. Teuter and Dr. Catena felt strongly that Babish continued to be unable to perform his job duties beyond that date. However, that does not end the analysis. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003) ("Nothing in the Act itself, however, suggests that plan administrators must accord special deference to the opinions of treating physicians. Nor does the Act impose a heightened burden of explanation on administrators when they reject a treating physician's opinion.") The Court must consider more broadly whether Defendants properly exercised their discretion under the Plan.

Under the Plan, an employee is "Totally Disabled" because of injury or sickness if he "cannot perform *each* of the material duties of his or her *regular occupation*." AR 250 (emphasis added). Thus, for the first 24 months, the test is whether Babish could perform his former job. Babish's job as a Software Engineer III required him to, among other things, perform software development for requests of a complex nature, design, code, install, modify, test, debug and

document software. The Software Engineer III job description also required problem resolution and off-hour support and required interaction with other members of a team and service partners. Minimum skills and abilities included solid technology planning and organizational skills, the ability to participate in team-based problem solving, and attention to detail. AR 99-103.

During the second review, Dr. Givens did not undertake ***any*** analysis of whether Babish could perform "each" of the material duties of his job. AR 45-48. Dr. Givens entirely failed to discuss the Plan's definition of "Total Disability" or Babish's job description. Indeed, it is unclear whether Dr. Givens applied the "own occupation" or "any occupation" standard. Dr. Givens opined that there was no evidence of suicidal or homicidal intent, no at-risk behavior and no delusional thoughts or hallucinations, but that is obviously far different from a conclusion that Babish could perform his job as a Software Engineer III. In summary, this aspect of Dr. Givens' analysis is "without reason."

In addition, Dr. Givens did not undertake ***any*** analysis of Babish's ability to think clearly and to concentrate. It is abundantly clear, based on the administrative record, that Babish's medical condition as of April 20, 2007 was far too tenuous to permit him to perform high-level cognitive thinking, to organize his thoughts and tasks, and to interact with team members. On December 28, 2006, Dr. Catena opined that Babish was "unable to concentrate on his work." AR 142. On February 2, 2007, Dr. Catena sent a letter to Sedgwick in which he opined that Babish was totally disabled for his position as a software engineer. AR 139. On February 21, 2007, Dr. Teuter opined: "He is currently not able to function in his profession as he is unable to concentrate and to focus." In her April 1, 2007 letter, Dr. Teuter opined that Babish "was currently unable to focus and to concentrate, that his thoughts were racing and not particularly

23

orderly or linear and permeated by paranoid ideation." AR 107. Dr. Teuter further reported the

disarray and disorganization in Babish's home, his labile mood, his continued symptoms of major

depression and anxiety, his continuing inability to keep focused and to concentrate, and opined:

"he continues to be unable to fulfill his job duties." *Id.* On April 26, 2007, Dr. Teuter reported

that Babish's concentration was "poor, very disorganized." AR 87. Indeed, the medical record is

virtually unanimous in this evaluation.[16] There is no evidence in the administrative record that

would support a conclusion that Babish *could* concentrate or think clearly.

Defendants rely heavily on the March 27 treatment notes. However, Dr. Kant did not

indicate that Babish had improved to such an extent that he was able to return to work. As Dr.

Kant explained in his telephone call with Dr. Givens, on March 27, 2007 Babish still had trouble

sleeping and a depressed and anxious mood. Moreover, Dr. Kant did not evaluate Babish's job

duties or opine regarding Babish's ability to concentrate, organize, plan, think logically or interact

with others in a work setting. Dr. Kant's notes are placed in context by Dr. Teuter's subsequent

report of Babish's medical condition on April 12, 2007, which was closest in time to the April 20,

2007 evaluation date established in the Consent Order. The April 12 report was not available to

Sedgwick at the time of its earlier decision and the Consent Order specifically required Sedgwick

to consider it. Dr. Teuter confirmed Dr. Kant's opinion that zoloft had led to improvements in

Babish's mood and symptoms. However, Dr. Teuter explained that "these minor gains instantly

vanish" when Babish is required to deal with institutions in the outside world. Dr. Teuter further

reiterated that Babish was "unable to function at this point," that his thought processes were

---

[16]It is undisputed that Babish suffered from major depression and generalized anxiety
disorder. Babish received short-term disability benefits and also received LTD benefits through
March 27, 2007.

disorganized and still included paranoid ideation, that his concentration was poor, and that he

continued to feel very anxious.  AR 85-87.  Dr. Givens summarized some of the comments made

in Dr. Teuter's April 26 report, but wholly failed to acknowledge – or respond to – her specific

opinions regarding Babish's fitness for employment.  Dr. Givens did not even mention Dr.

Catena's opinions.  Babish's medical providers consistently documented memory and

concentration problems that would disable him from performing at the high cognitive level

required by his job.  Dr. Givens' opinion is without reason and lacks substantial evidence.

In its July 31, 2008 decision to deny benefits, Sedgwick simply adopted and relied upon

the opinion of Dr. Givens.  As explained above, Dr. Givens performed only a cursory, results-

oriented review with at least two substantial flaws: (1) he entirely failed to analyze whether

Babish could perform each of the duties of a Software Engineer III; and (2) he failed to provide

any reasoning for disregarding the consistent medical record regarding Babish's continued

inability to concentrate, organize, plan or engage in logical reasoning in a work setting.

Defendants' decision suffers from the same flaws.  Accordingly, the Court concludes that

Defendants' denial of Babish's claim for LTD benefits was arbitrary and capricious.


3.      The Appropriate Equitable Relief

In *Lamanna v. Special Agents Mut. Benefits Ass'n*, 546 F.Supp.2d 261, 301-02 (W.D. Pa.

2008), the Court summarized:

> ERISA provides discretion in identifying "appropriate equitable relief" where the
> court has determined that the plan administrator acted arbitrarily or capriciously.
> 29 U.S.C. § 1132(a)(3); *see also Carney v. IBEW Local Union 98 Pension Fund*,
> 66 Fed.Appx. 381, 387 n. 2 (3d Cir.2003), cert. denied, 540 U.S. 1073, 124 S.Ct.
> 924, 157 L.Ed.2d 743 (2003). The court may remand the case for re-evaluation of

the claim or retroactively award benefits. *Carney, id.* at 387; *Cook v. Liberty Life Assur. Co.*, 320 F.3d 11, 24 (1st Cir.2003).

Plaintiff seeks the retroactive award of benefits. In support thereof, Plaintiff provides a calculation of "estimated benefits" through the end of the 24-month disability period. In addition, Plaintiff also requests that his case be remanded to Defendants for consideration of whether his physical problems (carpal tunnel syndrome and stenosis) render him disabled beyond 24 months. Defendants have not responded to this aspect of Plaintiff's motion.

Plaintiff concedes that its calculation of benefits is only an "estimate" and asks that the case be remanded, in any event. Accordingly, the Court will exercise its discretion to remand this case to Defendants for further proceedings in accordance with this opinion. Defendants are instructed to calculate and award LTD benefits for the entire 24-month period applicable to Babish's mental disability and to consider his claim for continued LTD benefits thereafter due to his claimed physical impairments.

In accordance with the reasons hereinabove set forth, DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Document No. 25) is **DENIED** and PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Document No. 26) is **GRANTED**.

Plaintiff may file a petition for counsel fees on or before March 23, 2009. Defendants shall file a response within twenty (20) days of Plaintiff's petition.

SO ORDERED this 2nd day of March, 2009.

BY THE COURT:

s/  Terrence F. McVerry
United States District Court Judge

26

cc:     Tybe A. Brett, Esquire
        Email: tbrett@stemberfeinstein.com

        Pamela G. Cochenour, Esquire
        Email: pgc@pbandg.com